# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 7, 2004 Session

## MICHAEL WAYNE HOWELL  v.  STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-14334     Hon. Otis Higgs, Jr., Judge**

---

**No. W2003-01056-SC-R11-PD - Filed November 16, 2004**

---

This case comes before us on a motion to reopen a petition for post-conviction relief. The petitioner alleges that he is mentally retarded as defined in Tennessee Code Annotated section 39-13-203(a) (2003), and therefore ineligible for the death penalty under State v. Van Tran, 66 S.W.3d 790 (Tenn. 2001) and Atkins v. Virginia, 536 U.S. 304 (2002). The trial court denied the motion, finding that the petitioner failed to make a prima facie showing of mental retardation sufficient to support reopening his post-conviction proceeding, and the Court of Criminal Appeals affirmed the denial. We reverse the Court of Criminal Appeals, holding that under the specific facts of this case, in which a petitioner is able, for the first time in his motion to reopen his petition for post-conviction relief, to claim ineligibility for the death penalty due to mental retardation under Van Tran or Atkins, the motion should be considered under the "colorable claim" evidentiary standard rather than the "clear and convincing" standard. We also hold that Tennessee Code Annotated section 39-13-203(a) (2003) clearly and unambiguously requires the defendant to have an I.Q. of seventy or below to be considered mentally retarded. We conclude that the petitioner's motion to reopen his post-conviction hearing set out a colorable claim, thus entitling him to an evidentiary hearing, without a jury, on the issue of mental retardation.

### Tenn. R. App. P. 11 Permission to Appeal; Judgment of the Court of Criminal Appeals is Reversed and Remanded

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON and ADOLPHO A. BIRCH, Jr., JJ., joined. FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER, J., each filed concurring and dissenting opinions.

Paul R. Bottei and Kelley J. Henry, Nashville, Tennessee, for the appellant, Michael Wayne Howell.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Senior Counsel, for the appellee, State of Tennessee.

# OPINION

## Background

The petitioner, Michael Wayne Howell, was convicted of grand larceny and felony murder, and on September 26, 1989, was sentenced to death. We affirmed the conviction and sentence of death, State v. Howell, 868 S.W.2d 238 (Tenn. 1993), and the United States Supreme Court denied his petition for writ of certiorari, Howell v. Tennessee, 510 U.S. 1215 (1994). Petitioner timely filed a petition for post-conviction relief, which was denied by the trial court, and the Court of Criminal Appeals affirmed that denial. Howell v. State, No. 02C01-9706-CR-00200, 1997 WL 746438 (Tenn. Crim. App. Dec. 3, 1997). Petitioner filed his first motion to reopen the petition for post-conviction relief on July 9, 1999, challenging the definition of reasonable doubt instruction, the constitutionality of using an after-occurring conviction as an aggravating circumstance, and the effectiveness of his counsel. The trial court denied the motion, the Court of Criminal Appeals affirmed the trial court, and this Court denied the petitioner's application for permission to appeal.

Petitioner filed this second motion to reopen his petition for post-conviction relief on December 3, 2002, arguing that because he is mentally retarded his death sentence violates the state and federal constitutions under State v. Van Tran, 66 S.W.3d 790 (Tenn. 2001), and Atkins v. Virginia, 536 U.S. 304 (2002). He asserts that the trial court erred in finding that he had not made a prima facie showing that he is mentally retarded and in applying an incorrect standard of review.

In support of his motion to reopen, the petitioner filed the affidavit of Dr. Daniel Grant, a licensed psychologist and board certified clinical neuropsychologist who evaluated the petitioner. Dr. Grant testified by affidavit that he conducted a clinical interview and administered a series of tests and procedures to assess the petitioner's level of intelligence, adaptive functioning, language skills, and memory functioning. He also reviewed numerous records pertaining to the petitioner. Dr. Grant testified that, because an I.Q. score is generally thought to involve an error of measurement of approximately five points, an I.Q. of seventy is considered to represent a band or zone of sixty-five to seventy-five. Dr. Grant stated that on the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III"), the petitioner obtained a verbal I.Q. of seventy-five, a performance I.Q. of seventy-five, and a full scale I.Q. of seventy-three; on the Stanford-Binet Intelligence Test - Fourth Edition, he achieved a composite score of sixty-two; and on the Comprehensive Test of Nonverbal Intelligence ("CTONI"), he had a nonverbal I.Q. of sixty-seven, a pictorial nonverbal I.Q. of seventy, and a geometric nonverbal I.Q. of sixty-eight. Dr. Grant stated that it was his opinion, to a reasonable degree of psychological certainty, that the petitioner's level of intellectual functioning is within the retarded range of intelligence. Dr. Grant further said that the petitioner's mental retardation manifested within the developmental period and also that the petitioner has significant

deficits in adaptive behavior.[1]

Without holding an evidentiary hearing, the trial court denied the petitioner's motion, finding that, even taking the petitioner's allegations as true, he did not meet the statutory criteria for mental retardation. The trial court held:

> Tennessee Code Annotated § 39-13-203(a)(1) specifically states that sub average intellectual functioning is evidenced by a functional intelligence I.Q. of seventy (70) or below. This statute does not in any way set forth that and [sic] I.Q. of seventy is considered to represent a band or zone of 65 to 75. T.C.A. § 3[9]-13-203(a)(1) is clear and unambiguous and there is no need to debate any further interpretation.

(citing State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002); Jackson v. Gen. Motors Corp., 60 S.W.3d 800, 804 (Tenn. 2001)). The trial court found that all three of the petitioner's I.Q. scores on the WAIS-III were higher than the score of seventy or below required to prove mental retardation. The trial court held:

> [T]he Petitioner has failed to meet the statutory requirements set forth in Tennessee Code Annotated § 39-13-203, adopted by the Court in Van Tran. He does not have an I.Q. of 70 or below, he has not manifested the requisite deficits in adaptive behavior, nor has he put forth proof that mental retardation manifested itself before the age of 18.[2] The Petitioner has failed to make a prima facie case that he was

---

[1] Interestingly, however, during both the post-conviction hearing and the sentencing phase of his trial the petitioner presented the testimony of Dr. Phillip J. Murphy, a clinical psychologist, stating that the petitioner's full scale I.Q. was ninety-one. Howell v. State, No. 02C01-9706-CR-00200, 1997 WL 746438, at *7 (Tenn. Crim. App. Dec. 3, 1997).

[2] With all due respect to the trial court and Chief Justice Drowota's dissent, the affidavit of Dr. Grant, filed along with the petition to reopen post-conviction proceedings, clearly stated, in pertinent part:

> Mr. Howell is mentally retarded as indicated by his Full Scale IQ of 73 on the WAIS-III, his Stanford Binet-Fourth Edition Composite (standard score) of 62, and his Comprehensive Test of Nonverbal Intelligence IW of 67. All of these scores meet the criteria for significantly subaverage general intellectual functioning as evidenced by an intelligence quotient (IQ) of 73 or below when the standard error of measurement is considered. (Affidavit of Dr.Grant., at ¶ 22.)

> Mr. Howell has significant deficits in adaptive behavior. For example, communication skills measured by Oral and Written Language Scales placed his listening Comprehension skills at a standard score of 69 (second percentile), Oral Expression standard score 68 (second percentile) and an Oral Composite standard score of 66 (first percentile) are significantly impaired. (Affidavit of Dr. Grant, at ¶23).

> His performance on the Managing Money subtest of the Independent Living Scale placed his ability to manage money, do monetary calculations, pay bills and take precautions with money at a standard score of 55. Mr. Howell's performance on these tests indicate his functional academic skills are

(continued...)

mentally retarded at the time he committed the offenses for which he was convicted. He does not qualify as a mentally retarded defendant in accordance with the criteria set forth in Tennessee Code Annotated § 39-13-203, and as such, his death penalty is not unconstitutional. This Motion to Re-Open Petition for Post-Conviction Relief is without merit and should be dismissed without the benefit of a hearing.

The Court of Criminal Appeals affirmed the trial court, and we granted the petitioner permission to appeal.

## Analysis

In 1990, the Tennessee General Assembly enacted legislation prohibiting the execution of mentally retarded individuals. Tenn. Code Ann. § 39-13-203 (2003). In 2001 this Court held that the statute was not intended by the General Assembly to be given retroactive application. Van Tran v. State, 6 S.W.3d 790, 798-799 (Tenn. 2001). Therefore, as the petitioner in Van Tran had been convicted prior to the enactment of the statute, he could not rely upon the statute for relief. Id. at 799. However, we also held in Van Tran that the execution of mentally retarded individuals violated constitutional prohibitions against cruel and unusual punishment. Id. at 811. In addition, while recognizing that the statute did not protect those persons convicted prior to its enactment, this Court held that this newly recognized constitutional right "warrants retroactive application to cases on collateral review." 66 S.W.3d at 811. Subsequent to our decision in Van Tran, the United States Supreme Court similarly held in Atkins v. Virginia that the execution of mentally retarded persons is cruel and unusual punishment prohibited by the Eighth Amendment. 536 U.S. 304, 321 (2002).

---

[2] (...continued)
significantly impaired. (Affidavit of Dr. Grant, at ¶ 24).

His performance on the Independent Living Skills test placed his adaptive skills at a Standard score of 61 (.9 percentile) which is clearly within the retarded range for adaptive behavior and meets the criteria as set forth by the AAMR. (Affidavit of Dr. Grant, at ¶ 25).

Mr. Howell's mental retardation manifested within the developmental period as noted in his school records and developmental history where there are numerous indications of mental retardation. Mr. Howell failed and repeated the first grade. In the second grade, Mr. Howell was passed to the third grade in spite of receiving three D's and three F's. By the fourth grade, Mr. Howell's grades included six F's and eight D's. He received a "social promotion" to the fifth grade. He continued to struggle through school until he arrived at high school. Mr. Howell failed and repeated the ninth grade, only to fail a second time. Rather than attempt grade nine a third time, Mr. Howell did not return to school. At the end of his second attempt at grade nine, Mr. Howell was ranked 105th in a class of 106. (Affidavit of Dr. Grant, at ¶ 21).

His [Mr. Howell's] school records and his developmental history clearly indicate he was mentally retarded before the age of 18. (Affidavit of Dr. Grant, at ¶ 26).

Van Tran, just as the case before us today, involved a petitioner who had been convicted prior to enactment of the statute, but who was now seeking post- conviction relief based upon his claim of mental retardation and our holding that executing mentally retarded individuals was unconstitutional. We recognized that, under the statutory scheme for obtaining post-conviction relief, reopening a petition for post-conviction relief was permissible if the claim "is based upon the ruling of an appellate court establishing a constitutional right that was not recognized at the time of trial, if retrospective application of that right is required." Tenn. Code Ann. § 40-30-117(a)(1) (2003); Van Tran 6 S.W.3d at 811-812. Therefore, in Van Tran, we directed the trial court to "hear the petitioner's motion to reopen and make a determination as to the petitioner's alleged mental retardation." 66 S.W.3d at 812. We concluded that although section 39-13-203 did not apply retroactively to the petitioner's case, the appropriate criteria for evaluating his claim of mental retardation were those set forth within the statute. Van Tran, 6 S.W.3d at 812. However, an issue we did not address in Van Tran was the appropriate standard by which the trial court would evaluate the petitioner's claim under those criteria to determine if he had pled a prima facie case. That is the issue we must now address in the present case in order to determine whether the petitioner has alleged a prima facie case of mental retardation to support reopening his petition for post-conviction relief.[3] Respectfully, in our view, neither of the dissenting opinions comes to grips with this issue.

Petitioner presents several arguments in this regard, and we will address each in turn. The thrust of these arguments can be summarized as focusing on two main points: 1) The definition of mental retardation applied to capital defendants has been interpreted too rigidly by the lower courts; and 2) The statutory dictates of the Post-Conviction Procedures Act have operated to deprive the petitioner of a fair opportunity to litigate his claim that he is ineligible for the death penalty due to mental retardation.

Petitioner argues that the requirement of an I.Q. of seventy or below, as contained in the definition of mental retardation in Tennessee Code Annotated section 39-13-203(a) (2003), should not be interpreted as a "bright-line" rule, but rather should be construed to make allowance for standard errors of measurement in the testing process so that a person with an I.Q. score above seventy could, in some circumstances, still be considered mentally retarded. Additionally, the petitioner argues that he presented a prima facie showing of mental retardation in his motion to reopen post-conviction proceedings, but that the trial court applied an incorrect standard of review and subsequently denied the motion without benefit of an evidentiary hearing. He contends by

---

[3] Chief Justice Drowota's dissent asserts that the trial court "scrupulously" followed the mandates of Van Tran and Tennessee Code Annotated section 39-13-203 in reaching its conclusion that the petitioner had not made a prima facie showing of mental retardation. This dissent concludes that the trial court did not abuse its discretion when it dismissed the petition to reopen. We note, however, that a trial court abuses its discretion if it applies "an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that [causes] an injustice to the party complaining." Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000)(citations omitted). In this case, the trial court never indicated what legal standard it had applied in making its determination that the affidavits submitted in support of the petition to reopen post-conviction proceedings had failed to set forth a prima facie showing of mental retardation. Therefore, we find it impossible to determine whether the trial court abused its discretion without knowing whether it applied the "clear and convincing evidence" standard or the "colorable claim" standard in evaluating the petition.

applying a "clear and convincing evidence" standard in reviewing his motion, rather than the "colorable claim" standard found in Tennessee Supreme Court Rule 28 section 6(B)(6), the trial court denied him due process.

In response, the State argues that the definition of mental retardation found in Tennessee Code Annotated section 39-13-203(a) clearly and unambiguously requires an I.Q. of seventy or below. Therefore, the statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an I.Q. above seventy could be considered mentally retarded.

The State further argues that a different standard applies when evaluating a motion to reopen post-conviction proceedings rather than an original petition for post-conviction relief. The State asserts that the "clear and convincing evidence" standard, set forth in Tennessee Code Annotated section 40-30-117(a)(4) is the correct standard in this instance and was appropriately applied by the trial court.

### *Tennessee Code Annotated Section 39-13-203(a)*
### *and the Definition of Mental Retardation*

We turn first to petitioner's argument that the definition of mental retardation, as contained in the applicable portion of the Tennessee Code, has been misinterpreted by the lower courts. As it applies to a defendant in a capital prosecution, the term mental retardation is defined by the state legislature as follows:

> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy or below; and
> (2) Deficits in adaptive behavior; and
> (3) The mental retardation must have been manifested during the developmental period , or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a) (2003).

This definition sets out a three-prong test to be utilized by a court in determining whether a capital defendant is mentally retarded and, therefore, ineligible for the death penalty. The petitioner argues that the statute's inclusion of an I.Q. score of seventy as a "bright-line" cutoff score is contrary to the prevailing views of mental retardation in the field of psychology. The petitioner's witness, Dr. Grant, stated in his affadavit that an I.Q. score will involve an error measurement of approximately five points and, therefore, the requirement of an I.Q. of seventy or below, as contained in the Tennessee statute, should be interpreted as representing a range of scores between sixty-five and seventy-five or below.

Without question, mental retardation is a difficult condition to accurately define. The United States Supreme Court, in Atkins v. Virginia, admitted as much, stating: "[t]o the extent there is

serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." 536 U.S. at 317. Generally accepted definitions within the scientific community will no doubt be refined as our knowledge in this area advances. At present however, the most widely recognized definitions of mental retardation include two basic characteristics: significantly subaverage intellectual functioning accompanied by related limitations in two or more adaptive skill areas (such as self-care, communication, or social skills), and manifestation of the condition before age 18.[4]

The question becomes how to provide valid guidelines to be used by the courts in determining when a defendant's intellectual functioning is "subaverage." In Atkins, the United States Supreme Court left it to the individual states to adopt appropriate definitions of mental retardation. The Court stated that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317. Therefore, the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id. (quoting Ford v. Wainwright, 477 U.S. 399, 405 (U.S. 1986)).

While the petitioner argues that the score of seventy should be interpreted, under our statute, to include a range of scores between sixty-five and seventy-five, we disagree.

A basic principle of statutory construction is that if the language of the statute is clear and unambiguous, then a court shall apply its plain meaning. See Boarman v. Jaynes, 109 S.W.3d 286, 291 (Tenn. 2003); Lavin v. Jordan, 16 S.W.3d 362, 365 (Tenn. 2000). In the present case, we find the language of the statute perfectly clear and unambiguous – to be considered mentally retarded, a defendant must have an I.Q. of seventy or below. The statute makes no reference to a standard error of measurement in the test scores nor consideration of any range of scores above the score of seventy. Therefore, we decline to "read in" such provisions, as the petitioner would have us to do, in order to extend the coverage of the statute. See Jackson v. General Motors Corp., 60 S.W.3d 800, 804 (Tenn. 2001) ("Legislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.") (quoting Hamblen County Educ. Ass'n v. Hamblen County Bd. of Educ., 892 S.W.2d 428, 431 (Tenn. Ct. App. 1994)).

The legislature, if it had desired, was free to include provisions establishing a range of I.Q. scores that would take into account measurement errors in the testing process. It could also have chosen to exclude any reference to specific scores altogether. However, it did neither. Instead, it enacted the current statute which provides a clear and objective guideline to be followed by courts when applying the three-prong test as set out in Tennessee Code Annotated 39-13-203(a) (2003).

Further evidence that the legislature intended to create such a bright line rule may be found

---

[4] See Atkins, 536 U.S. at n.3 (2002) (quoting both the American Association on Mental Retardation and the American Psychiatric Association definition of mental retardation.).

by examining the statutory definition of mental retardation as applied in the social services context. This definition, applicable to individuals seeking social services or disability benefits, is set out in Tennessee Code Annotated section 33-1-101 (17) and provides:

> "Mental retardation" means substantial limitations in functioning:
> (A) As shown by significantly sub-average intellectual functioning that exists concurrently with related imitations in two (2) or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and
> (B) That are manifested before eighteen (18) years of age.

Tenn. Code Ann. § 33-1-101(17) (2003 Supp.)

As is evident, this statute contains no reference to numerical I.Q. scores and is therefore less restrictive than Tennessee Code Annotated section 39-13-203(a). Additionally, section 33-1-101(17) was in existence at the time the legislature enacted section 39-13-203(a). Therefore, we must presume the legislature was aware of section 33-1-101(17), yet purposely chose to adopt a different definition of mental retardation to be applied in the criminal context. That the two statutes both touch upon the same subject matter, yet contain dissimilar provisions, is indicative of a legislative intent to have a different, more restrictive, standard apply to defendants in a capital prosecution. The legislature's decision to demarcate an I.Q. score of seventy or below in title 39, yet not to do so in title 33, clearly evidences this differing legislative intent with respect to the two sections of the code. See State v. Lewis, 958 S.W.2d 736, 739 (1997) (stating that "[w]hen one statute contains a given provision, the omission of the same provision from a similar statute is significant to show a different intent existed.") (citing State v. Davis, 654 S.W.2d 688, 699 (Tenn. Crim. App. 1983)).

While some states have adopted definitions of mental retardation that do not include specific numerical I.Q. scores,[5] other states employ definitions that, similar to Tennessee, include specific I.Q. scores as a determinative factor.[6] Therefore, while there appears to be no general national consensus regarding the use of numerical I.Q. scores as a factor in determining mental retardation, the use of such scores to establish a bright-line cutoff point for making this determination is not contrary to either the Supreme Court's holding in Atkins v. Virginia or with those definitions of mental retardation adopted by several other states. The Tennessee legislature has seen fit to adopt a score of seventy or below as a determinative factor in finding a person mentally retarded for purposes of carrying out a capital sentence. Based upon our analysis, we see no reason to question the validity of such an approach.

---

[5] See, e.g., Cal. Penal Code § 1376(a) (West 2004) (defining mental retardation as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior).

[6] See, e.g., Ky. Rev. Stat. Ann. § 532.130(2) (2004) (requiring "an intelligence quotient (I..Q.) of seventy (70) or below" to be considered mentally retarded); Murphy v. State, 54 P.3d 556, 568 (Okla. Crim. App. 2002) (requiring defendant claiming mental retardation to show an I.Q. of seventy or below "as reflected by at least one" scientifically recognized test).

The petitioner also argues that the trial court and the Court of Criminal Appeals erred in relying solely upon the results of the WAIS-III I.Q. test in making their determinations, while failing to even mention the other two I.Q. tests which he was administered.

The statute does not provide a clear directive regarding which particular test or testing method is to be used. The WAIS-III test has been called "the standard instrument in the United States for assessing intellectual functioning." Atkins, 536 U.S. at n.5. However, there is nothing in the record to indicate that other tests, such as the Stanford-Binet Intelligence Test - Fourth Edition, or the CTONI are not also accurate I.Q. tests. A court may certainly give more weight to one test, but should do so only after fully analyzing and considering all evidence presented. As we will explain more fully herein, under the particular facts of the present case, we hold the petitioner's motion should be reviewed applying the colorable claim standard, see Tenn. Sup. Ct. R. 28 § 2(H), which entails determining whether the claim, if taken as true, viewed in the light most favorable to petitioner, would entitle him to relief. A review under this standard would necessarily include giving full and fair consideration to all tests administered to the petitioner.

### *Appropriate Standard of Review and Due Process*
### *Under the Post-Conviction Procedures Act*

We now address petitioner's second main point - that the statutory dictates of the Post-Conviction Procedures Act work to deprive him, because of his unique circumstances, of a fair opportunity to litigate his claim that he is mentally retarded and therefore ineligible for capital punishment.

The United States Supreme Court recommended, in Case v. Nebraska, 381 U.S. 336 (1965), that the states create post-conviction procedures for addressing alleged constitutional errors occurring during the conviction process in order to supplement habeas corpus remedies. The General Assembly of Tennessee responded to that recommendation in 1967 by enacting the Post-Conviction Procedures Act. See Tenn. Code Ann. §§ 40-30-101 et seq. (2003); see also Burford v. State, 845 S.W.2d 204, 206 (Tenn. 1992).

Under the Act, a prisoner may file a petition for post conviction relief with the clerk of the court where the conviction occurred, Tenn. Code Ann. § 40-30-104(a) (2003), and "[r]elief shall be granted when the conviction or sentence is void or voidable because of the abridgment in any way of any right guaranteed by the constitution of this state or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2003). In order for a hearing to be granted, the petition must assert a "colorable claim." See Burnett v. State, 92 S.W.3d 403, 406 (Tenn. 2002). As previously discussed, a colorable claim is defined as "'a claim that, if taken as true, in the light most favorable to the petitioner, would entitle petitioner to relief under the Post-Conviction Procedure Act.'" Id. (quoting Tenn. Sup. Ct. R. 28 § 2(H)). If a petitioner makes this initial colorable claim to relief, an evidentiary hearing is held at which the petitioner must prove the allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003).

After a post-conviction proceeding has been completed and relief has been denied, as in this case, a petitioner may move to reopen his petition for post-conviction relief under the limited circumstances set out in Tennessee Code Annotated section 40-30-117 (2003). This statute provides only three grounds for reopening post-conviction proceedings: 1) a new constitutional right that is given retroactive application, 2) new scientific evidence of actual innocence, and 3) evidence of an improperly enhanced sentence. See Tenn. Code Ann. § 40-30-117(a)(1)-(3) (2003); Harris v. State, 102 S.W.3d 587, 591 (Tenn. 2003). Additionally, the statute requires that "[i]t appear[] that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced." Tenn. Code Ann. § 40-30-117(a)(4) (2003).

As can be seen, defendants petitioning for post-conviction relief are held to more stringent standards as they proceed further along in this process. They must present only a "colorable claim" to relief in an original petition, but in a motion to reopen a post-conviction proceeding they must present facts which "would establish by clear and convincing evidence" that they are entitled to relief. Id. These progressively higher standards attempt to balance the State's interest in maintaining the finality of judgments with a petitioner's interest in attacking a possibly unconstitutional conviction or sentence.

In the present case, the petitioner has moved to reopen his post-conviction proceedings on the ground that he has a new constitutional right - the right of a mentally retarded individual not to be executed - and that this right was given retroactive application. See Tenn. Code Ann. § 39-13-203(a) (2003); State v. Van Tran, 66 S.W.2d 790 (Tenn. 2001). In support of his motion to reopen, he filed the affidavit of Dr. Daniel Grant, who stated that the petitioner's scores on various I.Q. tests ranged between a low of sixty-two on the Stanford Binet Intelligence Test - Fourth Edition, to a high of seventy-five on the Wechsler Adult Intelligence Scale - Third Edition. These scores, along with other factors, led Dr. Grant to opine that the petitioner was mentally retarded.

Nevertheless, the trial court held that the petitioner had failed to make a prima facie showing that he was mentally retarded and denied him an evidentiary hearing. Petitioner argues that the trial court committed a constitutional error by applying the "clear and convincing evidence" standard in evaluating his motion to reopen his post-conviction petition instead of the "colorable claim" standard. Petitioner asserts that, because a person who now raises the issue of mental retardation for the first time in a petition for post-conviction relief is, under Tennessee Supreme Court Rule 28 section 6(B)(6), held only to a "colorable claim" standard, he has been denied due process by being required to present "clear and convincing evidence" of mental retardation, when he had no notice prior to Van Tran and Atkins that a mentally retarded person was constitutionally ineligible to receive capital punishment.

We have previously recognized that the State has no duty to enact post-conviction procedures and that the opportunity to collaterally attack constitutional violations occurring in the conviction process is not a fundamental right. See Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000); Burford, 845 S.W.2d at 207. The fundamental right of due process is, however, an over-arching issue that

has been recognized as a concern in post-conviction proceedings. See Burford, 845 S.W.2d at 207. What exactly is required in order to comply with due process in any given situation is often a difficult question. See Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000) (stating that "Due process is flexible and calls for such procedural protections as the particular situation demands.")(quoting Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993)). We have recognized that due process requires a defendant have "'an opportunity to be heard at a meaningful time and in a meaningful manner," House v. State, 911 S.W.2d 705, 711 (Tenn. 1995) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). Also, and perhaps most importantly, we recognize that due process "embodies the concept of fundamental fairness." Seals, 23 S.W.3d at 277.

This Court has previously carved out exceptions to the technical requirements of the Post-Conviction Procedures Act in order to protect petitioners' rights to due process. In Burford, we recognized that identification of the precise dictates of due process requires consideration of both the governmental interests involved and the private interests affected by the official action. 845 S.W.2d at 207 (citing Fusari v. Steinberg, 419 U.S. 379, 389 (1975)). We held that the petitioner's interest in attacking his conviction and sentencing on constitutional grounds was greater than the state's interest in preventing litigation of stale or fraudulent claims where the petitioner was forced to wait to bring his post-conviction claim until underlying convictions were declared invalid, at which time the three-year statute of limitations for bringing post-conviction claims had already run. Id. at 209. See also Van Tran, 66 S.W.3d at 812 (holding that considerations of "fundamental fairness" required that the petitioner have a meaningful opportunity to raise his substantive constitutional claim despite being contrary to the "technical" mandates of the Post-Conviction Procedure Act and Supreme Court Rule 28 governing waiver of issues); Williams v. State, 44 S.W.3d 464 (Tenn. 2001) (holding that attorney misrepresentation may toll the post-conviction statute of limitations despite the presence of statutory language stating that the statute of limitations shall not be tolled for any reason); Seals v. State, 23 S.W.3d 272 (Tenn. 2000) (mental incompetency may toll statute of limitations despite anti-tolling language).

In these prior cases, we have balanced the State's interest against the private interest at stake. In Seals we observed that in determining what procedural due process protections a particular situation demands we should consider: 1) the private interest involved; 2) the risk of erroneous deprivation of the interest; and 3) the government's interests, including fiscal or administrative burdens. Seals, 23 S.W.3d at 277. In this case, the State has a legitimate and strong interest in the finality of judgments, particularly at this point in the post-conviction process. See, e.g., Wright v. State, 987 S.W.2d 26, 29 (Tenn. 1999); State ex rel. Stewart v. McWherter, 857 S.W.2d 875, 876-77 (Tenn. Crim. App. 1992). However, the petitioner's interest is even stronger - his interest in protecting his very life. As in Burford, Williams, and Seals, the petitioner in this case has been confronted with circumstances beyond his control which prevented him from previously challenging his conviction and sentence on constitutional grounds. For these reasons, we find the petitioner's individual interests to outweigh those of the state under the specific facts of this capital case.

The State correctly points out that a defendant has no fundamental right to collaterally attack

a conviction on constitutional grounds. See Seals, 23 S.W.3d at 277. Further, the State asserts that "unless a fundamental right is involved, the test for determining whether a statute comports with substantive due process is whether the legislation bears a reasonable relation to a proper legislative purpose and is neither arbitrary or discriminatory." Newton v. Cox, 878 S.W.2d 105, 110 (Tenn. 1994). The State contends that the statute at issue complies with substantive due process as it is not arbitrary or discriminatory in its treatment of post-conviction petitioners - they all must meet the "clear and convincing" threshold requirement to reopen post-conviction proceedings. However, this argument misses the point. The central issue before us today is not whether the petitioner has a fundamental right to attack the conviction, but is instead whether he has been afforded a fair opportunity to prove he is mentally retarded and therefore assert his right not to be executed.

In Van Tran we held that executing mentally retarded individuals violated prohibitions against cruel and unusual punishment as contained in the Eighth Amendment to the United States Constitution and also Article I, § 16 of the Tennessee Constitution. See Atkins, 66 S.W.3d at 809. We had previously expounded upon our Eighth Amendment and Article I, § 16 jurisprudence in Burford, in which we determined that applying a statute of limitations to bar a post-conviction attack would deny the petitioner of a fundamental right. We stated in Burford:

> "If consideration of the petition is barred, [this petitioner] will be forced to serve a persistent offender sentence that was enhanced by previous convictions that no longer stand. As a result, [he] will be forced to serve an excessive sentence in violation of his rights under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution, which, by definition, are fundamental rights entitled to heightened protection."

Burford, 845 S.W.2d at 209.

If an excessively lengthy sentence implicates a fundamental right, as in Burford, then certainly a death sentence would as well. Therefore, contrary to the State's analysis, we find the case before us today does involve a fundamental right. We reject the State's attempt to frame the question as one of a right to attack a conviction rather than a right to be free from unconstitutional punishment. Also, while there is merit to the argument that procedural due process and substantive due process are conceptually different, we find that both encompass the central idea of fundamental fairness. If the petitioner in the present case is found to be mentally retarded, then he has a fundamental right not to be executed. Due process requires he be given a fair opportunity to litigate this claim in order to protect this right.

Therefore, we hold that under these specific and narrow circumstances in which a post-conviction petitioner files for relief for the first time under Van Tran or Atkins, requiring the petitioner to plead mental retardation by clear and convincing evidence in his motion to reopen his petition for post-conviction relief would be fundamentally unfair and a violation of due process. Because the petitioner was not able to previously advance his claim of mental retardation as a challenge to his eligibility to receive the death penalty, we find that he should be held to the lower

"colorable claim" standard instead of requiring him to plead facts to show his mental retardation by "clear and convincing evidence."

### *Evidentiary Hearing to determine Mental Retardation*

As explained above, the petitioner is entitled to a hearing if his motion sets forth a "colorable claim" of mental retardation. Testing of the petitioner by experts has yielded a wide range of I.Q. scores. Dr. Murphy testified during the petitioner's sentencing and during the first post-conviction proceeding that the petitioner's I.Q. was ninety-one, which was "not significantly below normal." As discussed previously, in support of the second motion to reopen post-conviction proceedings the petitioner produced an affidavit from Dr. Grant stating that his I.Q. scores ranged from sixty-two to seventy-three. Dr. Grant also testified in the affidavit that the petitioner's mental retardation manifested within the developmental period and that the petitioner has significant deficits in adaptive behavior. While we agree with the State that the petitioner has not shown in his motion that he is mentally retarded by "clear and convincing evidence," we conclude that, viewing the evidence in the light most favorable to petitioner, he has set forth a "colorable claim" that he is mentally retarded and is entitled to an evidentiary hearing.

Tennessee Code Annotated section 40-30-110(f) provides that, at a post-conviction evidentiary hearing, the petitioner "shall have the burden of proving the allegations of fact by clear and convincing evidence." This burden applies to petitioners making an initial claim for post-conviction relief or to those who have reopened post-conviction proceedings. However, under the current law, a defendant who now raises the issue of mental retardation at trial has only to prove the claim by a preponderance of the evidence. See Tenn. Code Ann. § 39-13-203(c) (2003). This disparity between the burden placed on defendants at trial and those now in the post-conviction stage raises due process concerns.

All petitioners who are now, through post-conviction proceedings, claiming exemption from capital punishment due to mental retardation under Atkins or Van Tran have one fact in common - they were not afforded an opportunity to raise these claims at trial, yet the right to do so has been applied to them retroactively. See Van Tran 66 S.W.3d at 811. This includes defendants filing an initial petition for post-conviction relief as well as those, such as the petitioner in the present case, who have concluded post-conviction proceedings but now attempt to reopen them based on this newly recognized constitutional right. To apply this right retroactively, yet at the same time hold post-conviction petitioners to a higher burden of proof than defendants at trial is fundamentally unfair. Therefore, we hold that applying the "clear and convincing" burden of proof to petitioners who are now for the first time, in either an initial petition for post-conviction relief or in a motion to reopen post-conviction proceedings, able to raise a claim of mental retardation to avoid capital punishment violates the due process rights of the post-conviction petitioners.

The issue of proper burden of proof was addressed in Cooper v. Oklahoma, in which the United States Supreme Court stated:
The function of a standard of proof, as that concept is embodied in the Due Process

Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'

Cooper v. Oklahoma, 517 U.S. 348, 362 (1996)(quoting In re Winship, 397 U.S. 358, 370 (1970)).

At issue in Cooper was whether a defendant could be required to prove incompetence to stand trial by clear and convincing evidence. Id. at 350. Although the defendant could not prove his claim clearly and convincingly, the Court found that he had shown he was more likely than not incompetent to stand trial. Id. at 355. The Court analyzed both the traditional manner in which burdens of proof are allocated along with the State's interest in the case at bar. The Court stated:

The deep roots and fundamental character of the defendant's right not to stand trial when it is more likely than not that he lacks the capacity to understand the nature of the proceedings against him or to communicate effectively with counsel mandate constitutional protection.

Cooper, 517 U.S. at 368. Finding that executing a defendant who was more likely than not incompetent would violate due process, the Court held that the defendant must be allowed to prove incompetency by a preponderance of the evidence. Id. at 369.

As previously noted, executing the mentally retarded has been found by both the Tennessee Supreme Court and the United States Supreme Court to violate constitutional protections. A majority of this Court, in Van Tran, held that evolving standards of decency in society argued against executing mentally retarded defendants. 66 S.W.3d at 801. We recognized that the Tennessee General Assembly had enacted legislation prohibiting such executions, Tenn. Code Ann. § 39-13-203 (2003), and we viewed this as a valid reflection of society's views on this issue. Van Tran, 66 S.W.3d at 805. We also noted the parallel concerns raised regarding incompetency to stand trial and mental retardation. Id. at 806-807. We point out that the statute to which we refer allows a capital defendant to prove mental retardation by a preponderance of the evidence. Tenn. Code Ann. § 39-13-203(c) (2003).

As evidenced in both statutory and case law, society does not wish to execute mentally retarded individuals. Therefore, as a burden of proof should reflect the degree of confidence our society thinks most appropriate in making a determination, see Cooper, 517 U.S. at 362, then mental retardation should be determined by preponderance of the evidence, as set forth in Tennessee Code Annotated section 39-13-203(c). Just as the Supreme Court held in Cooper regarding incompetency, we conclude that it would violate due process to execute a defendant who is more likely than not mentally retarded.

As Van Tran and Atkins make clear, mentally retarded individuals have a constitutional right

-14-

not to be executed.[7] We recognize that our holding today is at odds with the standard set out in Tennessee Code Annotated section 40-30-117. However, were we to apply the statute's "clear and convincing" standard in light of the newly declared constitutional right against the execution of the mentally retarded, the statute would be unconstitutional in its application. Therefore, in light of the fact that the petitioner could not have litigated his claim at any earlier proceeding, we hold that at an evidentiary hearing, he will have the opportunity to prove mental retardation by preponderance of the evidence.

We are mindful that holding the petitioner to a preponderance of the evidence standard at this hearing may increase the burden upon the State in defending against the claim. In the present case, however, the risk to the petitioner of an erroneous outcome is dire, as he would face the death penalty, while the risk to the State is comparatively modest. See Cooper, 517 U.S. at 364-365 (comparing the risk of incompetent defendant standing trial versus State's risk of incorrect competency determination). The balance, under these circumstances, weighs in favor of the petitioner and justifies applying a preponderance of evidence standard at the hearing.

### *Demand for a Jury Trial under Apprendi and Ring*

Petitioner next argues that he is entitled to have a jury, rather than the trial court judge, determine whether he is mentally retarded. The petitioner would also place the burden on the State to prove his lack of mental retardation. Petitioner bases this argument upon the Supreme Court's holding in Apprendi v. New Jersey,[8] and Ring v. Arizona.[9] Both Apprendi and Ring essentially held that a jury must determine any aggravating factors used to enhance a criminal sentence beyond the statutory maximum.[10] The petitioner asserts that a defendant's lack of mental retardation is the functional equivalent of an aggravating circumstance and therefore must be found by a jury. We disagree.

Under Tennessee's capital sentencing scheme, a jury determines guilt and also, in a separate proceeding, determines whether to impose the death penalty. See Tenn. Code Ann. § 39-13-204 (2003). This sentencing scheme is qualitatively different from the Arizona statute in Ring. Under

---

[7] See Van Tran, 66 S.W.3d at 792; Atkins, 536 U.S. at 321.

[8] 530 U.S. 466 (2000).

[9] 536 U.S. 584 (2002).

[10] The Supreme Court held in Apprendi that all factual issues used to enhance a criminal sentence beyond the statutory maximum must be found by a jury. 530 U.S. at 491-92. This reasoning was extended in Ring to apply to capital sentencing proceedings. 536 U.S. at 589. We also note that, although not cited by the petitioner, the latest in this line of cases is Blakely v. Washington, No. 02-1632, 2004 WL 1402697, (U.S. June 24, 2004). In Blakely, the Court held that the statutory maximum sentence, as expressed in Apprendi, is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at *6.

the Arizona law at issue in Ring, the maximum penalty for murder was death;[11] however, this sentence could only be imposed if the judge, not the jury, found aggravating factors present to support the death penalty.[12]

In contrast, under Tennessee's capital sentencing scheme, it is the jury, the very same jury, in fact, that found the defendant guilty, that decides whether to impose the death penalty. Tenn. Code Ann. § 39-13-204 (2003). In its deliberations, the jury is instructed to consider "any evidence tending to establish or rebut the aggravating circumstances . . . and any evidence tending to establish or rebut any mitigating circumstances." Tenn. Code Ann. § 39-13-204(c) (2003). Diminished mental capacity is among the mitigating factors that may by weighed against aggravating factors by the jury. See Tenn. Code Ann. section 39-13-204(j). However, mental retardation is now a threshold issue that determines whether a defendant is eligible for capital punishment at all. Following Van Tran and Atkins, mental retardation completely exempts a defendant from capital punishment, rather than simply being among the mitigating factors to be weighed against aggravating factors by the jury.

The United States Supreme Court, in Atkins, pointedly expressed that mental retardation should be considered apart from mitigating factors. The Court stated "mentally retarded defendants [are less able] to make a persuasive showing of mitigation in the face of ...aggravating factors." Atkins, 536 U.S. at 320. The Court went on to state that the demeanor of mentally retarded defendants may give the false impression of lack of remorse. Id. at 321. This reasoning was also evident in Van Tran, in which we found that "the limitations and impairments associated with mental retardation warrant more consideration than simply allowing the evidence to be weighed in the mix of aggravating and mitigating circumstances." 66 S.W.3d at 810.
The Tennessee General Assembly apparently agrees, as evidenced by its placing the prohibition on executing mentally retarded individuals in Tennessee Code Annotated section 39-13-203 rather than placing it among the mitigating factors listed in Tennessee Code Annotated section 39-13-204(j). Accordingly, the petitioner's reliance upon Ring is misplaced, as the issue is not one of aggravating or enhancing factors, but of eligibility for the sentence imposed by a jury.

Further, the *lack* of mental retardation does not operate as "the functional equivalent of an element of a greater offense" that subjects the defendant to a greater penalty and which must be proved by the State beyond a reasonable doubt. See Apprendi, 530 U.S. at 494, n.4. Both Apprendi and Ring dealt with cases in which the court made factual findings to increase the defendant's sentence beyond what was available based solely upon the jury's verdict. See Apprendi, 530 U.S. at 482-483; Ring, 536 U.S. at 609. In fact, Apprendi carefully distinguished between facts used to enhance a sentence and those used to lessen a sentence:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by
> that jury verdict to sentence the defendant to the maximum sentence provided by the

[11] Ariz. Rev. Stat. Ann. § 13-1105(c) (West 2001); See also, Ring, 536 U.S. at 592.

[12] Ariz. Rev. Stat. Ann. § 13-703 (West 2001); See also, Ring, 536 U.S. at 592-593.

murder statute.  If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.  Core concerns animating the jury and burden -of-proof requirements are thus absent from such a scheme.

Apprendi, 530 U.S. at 490, n.16.

Tennessee's capital sentencing procedure is just such a scheme  as discussed by the Court in Apprendi.   Under this procedure, mental retardation works to reduce the maximum possible sentence, based upon the jury's verdict, from death to life imprisonment.  Therefore, it is not an element of the offense and is not required to be proven by the State nor found by a jury.

We also point out that our holding today is in line with an ever-growing number of courts to have considered the issue and held likewise.  See Headrick v. True, 2004 WL 594989 at *25 (W.D. Va. March 24, 2004) (mental retardation is not the equivalent of an element of the offense); In re Johnson, 334 F3d 403, 405 C.A. 5 (Tex.) 2003 (absence of mental retardation is not element of offense); Russell v. State, 849 So. 2d 95, 148 (Miss. 2004) (Ring has no application to Atkins determination); State v. Flores, 93 P3d 1264, 1267 (N.M. 2004) (Ring not applicable to mental retardation determination); Head v. Hill, 587 S.E.2d 613, 619 (Ga. 2003) (Ring and Atkins do not require jury trial on issue of mental retardation); State v. Lott, 779 N.E.2d 1011, 1015 (Ohio 2002) (mental retardation does not represent a jury question); Ex parte Briseno, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004) (lack of mental retardation is not implied element of capital murder).

Therefore, we hold that the determination of mental retardation is more appropriately left to the trial court judge, as contemplated under Tennessee Code Annotated section 39-13-203(c) which states "[t]he determination of whether the defendant was mentally retarded at the time of the offense of first-degree murder shall be made *by the court*." (Emphasis added).  Further, the burden of persuasion in this respect is upon the defendant rather than the State.  See Tenn. Code Ann. § 39-13-203(c) (2003).

**CONCLUSION**

In sum, we find that requiring a petitioner, who for the first time is able to raise a claim of mental retardation under Atkins or Van Tran, to prove his claim by clear and convincing evidence is fundamentally unfair and infringes upon the petitioner's due process rights.  Therefore, we hold that under these very limited factual circumstances in which a petitioner is now for the first time able to raise this claim, if an initial petition for post-conviction relief or a petition to reopen post-conviction proceedings presents a colorable claim to relief the petitioner shall be entitled to an evidentiary hearing on the issue of mental retardation.  At this hearing, petitioner will have the opportunity to prove mental retardation, as defined in Tennessee Code Annotated section 39-13-203(a), by a preponderance of the evidence.

The costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE